RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0203p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

HECK VAN TRAN,

          *Petitioner-Appellant,*

    *v.*

ROLAND COLSON, Warden,

          *Respondent-Appellee.*

No. 11-5867

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis
No. 2:00-cv-2451—Samuel H. Mays, Jr., District Judge.

Argued: June 12, 2013

Decided and Filed: August 25, 2014

Before: ROGERS, COOK, and WHITE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Robert L. Hutton, GLANKLER BROWN, PLLC, Memphis, Tennessee, for Appellant. James E. Gaylord, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Robert L. Hutton, GLANKLER BROWN, PLLC, Memphis, Tennessee, Brock Mehler, Nashville, Tennessee, for Appellant. James E. Gaylord, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. Steven J. Mulroy, CECIL C. HUMPHREYS SCHOOL OF LAW, Memphis, Tennessee, for Amici Curiae.

---

**OPINION**

---

ROGERS, Circuit Judge. Heck Van Tran, a Tennessee prisoner under sentence of death, appeals the district court's judgment denying his petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254. Van Tran raised twenty-six claims in his original habeas petition. The district court and this court have certified three claims for this appeal: (1) whether Van Tran is intellectually disabled and his execution would therefore violate the Eighth Amendment under *Atkins v. Virginia*, 536 U.S. 304 (2002);[1] (2) whether, as applied to Van Tran's crime, the "heinous, atrocious, or cruel" aggravating circumstance of the capital jury instruction violates the Eighth and Fourteenth Amendments; and (3) whether Van Tran's penalty phase counsel was ineffective, thereby violating the Sixth, Eighth, and Fourteenth Amendments. The district court committed no error in denying the writ of habeas corpus on the second and third claims. With respect to the first claim, however, because the Tennessee state court's decision did not apply the proper legal standard for assessing whether Van Tran has intellectual disability, which was announced in a recent decision of the Tennessee Supreme Court, the district court's judgment must be vacated and remanded. In accordance with the Supreme Court's command that the procedural scheme for enforcing *Atkins* is within the state's purview and because the State is faced with a state law–imposed procedural burden it could not have anticipated at the time of the original state-court *Atkins* hearing, we remand for the entry of a conditional writ of habeas corpus to allow the state courts to consider Van Tran's *Atkins* claim under the proper, now-governing standard.

## I.

Heck Van Tran was born in 1966 in Vietnam, during the Vietnam War, the son of a Vietnamese woman and an American serviceman. Van Tran's father died two years after his birth. Van Tran and his mother lived in poverty, and as a young child Van Tran suffered severe social deprivation and inadequate support. He began speaking at a late age, although even after beginning to speak he had difficulty articulating words and spoke infrequently and in short

---

[1]The lower courts in this case, as well as the parties until now, have used the term "mental retardation" to describe a neurological condition typified by significant limitations in both intellectual and adaptive functioning. More recent judicial opinions and the professional community have adopted the contemporary term "intellectual disability," which describes the identical specific condition (despite the new term's arguably different sense in common parlance). *See Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014). This semantic practice has also been adopted by the State of Tennessee. *Coleman v. State*, 341 S.W.3d 221, 226 n.5 (Tenn. 2011); 2010 Tenn. Pub. Acts ch. 734 (modifying Tenn. Code Ann. § 39-13-203). In light of the practice now accepted among courts, legislatures, and the professional community, we adopt for our present analysis the term "intellectual disability." However, where quoting and discussing previous opinions and reports that employed the term "mental retardation," we will employ the old term for clarity of reference.

phrases. He and his mother were relocated to Memphis by a charitable organization in 1983. He attended one year of school in the United States, during which he had good attendance but got poor grades. He dropped out in 1984.

In October 1987, Van Tran and three accomplices participated in an armed robbery of the Jade East Restaurant in Memphis, Tennessee, where Van Tran had been employed and from which he had been fired a month or two before. During the robbery, three people were killed. A fourth, a seventy-five-year-old woman, was beaten and knocked unconscious. The victims were all related and worked in the restaurant together. The robbers obtained a few jewelry cases from the restaurant's back office, and two diamond rings, a necklace, and a watch that were taken from the survivor's person. A detailed summary of the incident, including the ensuing interstate manhunt, is found in the Tennessee Supreme Court's statement of the facts at *State v. Van Tran*, 864 S.W.2d 465, 468–70 (Tenn. 1993). For the purposes of this appeal, it suffices to summarize a few additional facts.

During the robbery, Van Tran twice shot Kai Yin Chuey, a slight, seventy-four-year-old woman. The first time he shot her through her windpipe, although he claims that this was an accident. A few moments later, he placed the gun directly against the back of her skull and shot her again, killing her instantly. During the robbery, two others were killed. Van Tran shot one of them in the face; his accomplices shot the other while Van Tran collected the loot.

Six months later, Van Tran was arrested in Houston, where he confessed that he participated in the robbery. After trial, Van Tran was convicted of three counts of felony murder; he was sentenced to death for each count on the basis of two aggravating circumstances, one of which was that the murder was found to be "especially cruel in that it involved depravity of mind." *Id.* at 470.[2] On direct appeal, the Tennessee Supreme Court affirmed Van Tran's convictions on the three counts of felony murder, but reversed his sentence of death for two of the three murders, affirming the death sentence only for the murder of Kai Yin Chuey. *Id.* at 482. In arriving at this decision, the state supreme court disapproved of the deletion of the words

---

[2]Under the Tennessee Code at the time, a defendant could be sentenced to death if the jury found that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." *Van Tran*, 864 S.W.2d at 478 (quoting Tenn. Code Ann. § 39-2-203(i)(5) (1982)).

"heinous" and "atrocious" from the aggravating circumstance instruction. However, the court ultimately affirmed on the grounds that the curtailed instruction did not likely confuse the jurors, that the jury still made the dispositive "depravity of mind" finding, and relatedly, that the failure to include those terms in the instruction had no effect on the result. *Id.* at 479.

In addition, the Tennessee Supreme Court independently determined that there was sufficient evidence presented at trial to find that the killing of Kai Yin Chuey evinced "depravity of mind." *Id.* at 480. In making this determination, the court summarized the murder in the following manner:

> In [Kai Yin Chuey's] case we have a helpless 74-year-old woman, who had already been shot by the Defendant and was lying on the floor unable to protect herself when the Defendant put a gun to the back of her head and shot her a second time. We find the evidence of this brutal and senseless execution of a helpless old woman sufficient to support this aggravating circumstance in the murder of Kai Yin Chuey.

*Id.*

Van Tran filed a state postconviction petition in March 1995, claiming, among other things, that he received ineffective assistance of counsel and that he should not be executed because he is mentally retarded and incompetent. After being denied relief in the postconviction trial court, Van Tran appealed to the Tennessee Court of Criminal Appeals (TCCA), where the trial court's judgment was affirmed. *Van Tran v. State*, No. 02C01-9803-CR-00078, 1999 WL 177560, at *13 (Tenn. Ct. Crim. App. Apr. 1, 1999). Regarding Van Tran's claim of ineffective assistance of counsel for failure to investigate and present additional mitigating evidence during the penalty phase, the appellate court found that trial counsel conducted a proper investigation and that there was no prejudice. *Id.* at *11–12. As to whether Van Tran's execution was prohibited by state statute because of his mental retardation, the appeals court deferred to the postconviction trial court's finding that Van Tran's I.Q. was above 70, which was based upon the State's expert's testimony that Van Tran's expert had misread the manual related to I.Q. calculation and had arrived at an erroneously low figure. *Id.* at *6.

With respect to only the issue of whether Van Tran's execution was prohibited because of mental retardation, Van Tran's petition eventually reached the Tennessee Supreme Court, which

took up the case "in order to clarify the procedure by which a prisoner who has been sentenced to death may raise the issue of present mental competency to be executed." *Van Tran v. State*, 6 S.W.3d 257, 260 (Tenn. 1999). The court denied Van Tran's request for relief primarily on the ground that the issue of his competency for the purposes of execution was not ripe for resolution, because the execution was not imminent. *Id.* at 274. Van Tran filed a motion to reopen his postconviction petition in February 2000, alleging that new evidence established that he was mentally retarded and was therefore ineligible for the death penalty under state law. When this petition reached the Tennessee Supreme Court, that court announced as an issue of first impression that execution of mentally retarded persons was prohibited by the Eighth Amendment of the U.S. Constitution and Article I, Section 16 of the Tennessee Constitution. *Van Tran v. State*, 66 S.W.3d 790, 809 (Tenn. 2001). The state supreme court remanded to the postconviction trial court for a hearing on the issue of whether Van Tran qualified as mentally retarded. *Id.* at 812. Furthermore, the court held that mental retardation, for the purposes of the state and federal constitutions, was defined by the Tennessee Code. The code defined mental retardation, for the purposes of prohibiting the execution of those with mental retardation, according to the following three necessary criteria: "(1) significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below; (2) deficits in adaptive behavior; and (3) mental retardation manifested during the developmental period, or by eighteen (18) years of age." *Id.* (citing Tenn. Code Ann. § 39-13-203 (1997)). Within a year, the United States Supreme Court would similarly hold that the execution of persons with mental retardation violates the United States Constitution. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).[3]

On remand, the postconviction trial court held a trial to determine whether Van Tran was mentally retarded as defined by § 39-13-203 of the Tennessee Code. At the trial, two psychologists testified that Van Tran is mentally retarded under the statute's definition. *Van Tran v. State*, 2006 WL 3327828, at *2–13 (Tenn. Ct. Crim. App. Nov. 9, 2006). Both doctors based their conclusions on tests personally administered to Van Tran, his institutional records,

---

[3]Because the United States Constitution provides the legal basis for habeas relief in this court and *Atkins* and *Van Tran* announce identical prohibitions on the execution of persons with intellectual disability, we will refer to the claim that a capital defendant cannot be executed because of intellectual disability as an *Atkins* claim.

and interviews with him, his mother, and others who knew him. In addition to finding that Van Tran currently has an I.Q. of seventy or below and suffers from numerous deficits in adaptive behavior,[4] both experts concluded that Van Tran's deficits manifested themselves during the developmental period, before Van Tran was eighteen years old. Dr. Daniel Grant based this conclusion on a social history that discussed Van Tran's late language skills, his difficulties in school, and his lack of success in living independently. *Id.* at *5. Dr. Pamela Auble based her conclusion that Van Tran's impairments appeared during the developmental period on numerous risk factors provided in the tenth edition of the American Association on Mental Retardation's reference manual, including a traumatic brain injury during youth, malnutrition, poverty, lack of social resources, and prenatal maternal smoking. *Id.* at *11; *see also* American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 127 tbl. 8.1 (10th ed. 2002) ("*AAMR 10th*").

The State presented no testimony to contradict the findings of Van Tran's experts, although it did test Van Tran's experts with some cross-examination.

The postconviction trial court denied Van Tran's request for relief, finding that he had not demonstrated mental retardation under the Tennessee statute by a preponderance of the evidence. *Van Tran*, 2006 WL 3327828, at *15. Although the court found that Van Tran satisfied the first prong by proving that he has a functional I.Q. of seventy or below, the court determined that Van Tran had failed to meet his burden of proof for the second and third prongs. With respect to the second prong, the existence of deficits in adaptive behavior, the court found that Van Tran had demonstrated an adaptive deficit in only one area, that of communication. The court weighed the experts' testimony against evidence that Van Tran had held a few jobs and had occasionally cooked for and cared for others. The court held that, in light of the

---

[4]The trial court, following some of the experts' testimony and the typical test used by Tennessee courts, adopted the following definition of "adaptive deficits" for the purposes of the second prong:

> The DSM-IV defines adaptive behavior using a set of ten criteria, as adopted from the Manual of the American Association of Mental Retardation 9th Edition. The ten criteria listed for consideration include: social interpersonal skills, communication, self-direction, work, leisure, home living, functional academics, self-care, health and safety, and use of community resources. In order to have significant deficits in adaptive behavior, a person must demonstrate deficits in at least two of these areas.

*See also Van Tran*, 66 S.W.3d at 795 (endorsing ten-area framework).

evidence of Van Tran's at least somewhat successful social and individual functioning, he had not demonstrated by a preponderance of the evidence that he suffered adaptive deficits in the areas of self-direction, social interpersonal skills, personal health and safety, or functional academics. *Id.* at *16. Because the court found that Van Tran suffered from a deficit in only one area of adaptive functioning, it concluded that Van Tran did not meet the second prong. Regarding the third prong, the trial court found that Van Tran had not presented sufficient evidence demonstrating the manifestation of deficits before the age of eighteen. The court noted that no test of intellectual functioning was administered prior to Van Tran's incarceration and that neither testifying expert "could offer any real proof to establish that the deficits occurred prior to the age of eighteen." *Id.* at *17. The court also noted that Van Tran's current deficits, rather than being caused by neurological deficit, could have been caused by neglect or paranoid schizophrenia, which had not been diagnosed for many years. *Id.*

On appeal, the TCCA affirmed the trial court's denial of Van Tran's request for relief. *Id.* at *27. The appellate court agreed with the trial court that some of the adaptive functioning tests used by Van Tran's experts were untrustworthy because they relied on interviews with people that either had not observed Van Tran frequently or had not observed him in a non-institutionalized setting. *Id.* at *23. The appellate court emphasized Van Tran's unique position, suggesting that Van Tran's limited education, history of drug and alcohol use, schizophrenia, and lack of ordinary life experiences all negatively impacted the effectiveness of the living skills tests that were used by the experts:

> We agree with the trial court's assessment that the Petitioner is in a unique position. The Petitioner was born in Vietnam. There is no question that the Petitioner's childhood was atypical. His social history reveals abuse, neglect, and social ostracism. He essentially "lived on the streets" until age seventeen when he came to this country through the assistance of Catholic Charities. The Petitioner's formal schooling was limited to several years in Vietnam and about one year in this country. The Petitioner has spent the majority of his time in this country incarcerated. While the Petitioner's experts maintained that the Petitioner was more proficient in the English language than in Vietnamese, proof at the Petitioner's original post-conviction hearing indicated that the Petitioner had difficulty communicating with trial counsel until a Vietnamese interpreter was appointed. A social worker with Catholic Charities testified that the Petitioner spoke and understood the Vietnamese language. The Petitioner has a history of drug and alcohol use. The Petitioner has also been diagnosed with paranoid

schizophrenia.  The proof also corroborates the trial court's conclusion that the Petitioner was in a position unique to most American adults.  Dr. Grant conceded that the Petitioner had probably never "filled out a check, or a money order." Moreover, there is no indication that the testing questions took into account the Petitioner's lifestyle in Vietnam or that he has spent the majority of his adult life incarcerated.  Accordingly, we agree with the trial court's assessment that little weight should be given to the Petitioner's below average score on the Independent Living Scale.

*Id.* at *24.  The court also found:

The circumstances of the Petitioner's crime belie any assertion that the Petitioner suffered from any deficit in intellectual ability or adaptive skills.  The Petitioner had previously been employed by the victims of his crime.  He knew the layout of the restaurant and knew that jewelry was kept on the premises.  The Petitioner did the talking with one of the victims at the onset of the crime.  The Petitioner was the person that went into the office to collect the jewelry.  After the crime, the Petitioner escaped with two of his co-defendants to Houston, Texas, where it was the Petitioner who arranged to sell the jewelry to a Vietnamese man for $4,000.  It was also the Petitioner who paid this man from the proceeds and divided the money with his two co-defendants.

*Id.* at *25.  Finally, the appellate court determined that Van Tran had not demonstrated that his intellectual deficits manifested themselves prior to his reaching the age of eighteen:

The Petitioner had not been administered any test of intellectual functioning prior to reaching the age of eighteen, and no testing was performed until ten years after his incarceration.  The only proof establishing this third prong [was] reliance upon social factors present in the Petitioner's childhood, including extreme poverty and child abuse.  In this regard, we cannot conclude that the trial court's conclusion that the Petitioner's late development could have been the result of "neglect" rather than neurological deficit was in error or contrary to the evidence.  The evidence of poverty, child abuse, lack of education, family dysfunction and poor social conditions are not enough to demonstrate that any deficits manifested during the developmental period.  The proof established that the Petitioner supported himself, took care of others, and was employed.  The proof also established that the Petitioner, with the aid of an interpreter, was able to assist and communicate with his trial attorneys.  The occurrences of these abilities all occurred after the age of eighteen.  Moreover, we conclude that the fact that the Petitioner admits to alcohol and drug abuse and the fact that he has been diagnosed with schizophrenia may have impaired his brain functioning.  Finally, Dr. Auble's litany of potential "risk factors" fail to provide sufficient facts to support the conclusion that any impairments were revealed during the developmental period.  Accordingly, Petitioner cannot satisfy the third prong of the test for mental retardation.

*Id.* at *26.

Tran originally filed his federal habeas petition in May 2000. In May 2001, the district court entered an order holding the petition in abeyance while Van Tran exhausted his state-court remedies. *Tran v. Bell*, 145 F. Supp. 2d 939 (W.D. Tenn. 2001). The district court took the case out of abeyance in April 2007, after which Tran filed an amended petition raising twenty-six claims in December 2007.

On September 30, 2010, the district court denied Van Tran's petition in its entirety. Order, *Van Tran v. Bell*, No. 00-2451-SMH, at 140 (W.D. Tenn. Sept. 30, 201) ("District Court Order"). Regarding Van Tran's *Atkins* claim, the district court first held that the state court's determination that Van Tran was not limited in functional academics was an unreasonable determination of the facts based on the evidence presented in the state court. *Id.* at 64. This determination meant that Van Tran met his burden for the second prong, because the state court had already found that he had a deficit in one other area, that of communication. However, the district court went on to find that the state court was reasonable in its determinations that Van Tran did not suffer from deficits in the areas of self-direction and social/interpersonal skills, on the ground that the state court was able to base its conclusion on record evidence that contradicted the experts' testimony about Van Tran's gullibility, lack of personal responsibility, and mental rigidity. *Id.* at 66–68.

Despite finding that the state court was not reasonable in finding that Van Tran did not suffer from deficits in adaptive behavior, the district court found reasonable the state court's ultimate finding that Van Tran had not sufficiently demonstrated mental retardation, based solely upon Van Tran's failure to meet the third prong. In particular, the district court held that the state postconviction appellate court's finding, namely that Van Tran did not sufficiently demonstrate that his intellectual deficits manifested themselves in the developmental stage, was neither contrary to nor an unreasonable application of federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented. *Id.* at 75. The district court reasoned that "[a]n expert's testimony that an individual is 'at risk' of mental retardation because of congenital factors, poverty, and abuse is not enough to support an *Atkins* claim." *Id.* at 74 (citing *In re Mathis*, 483 F.3d 395, 398–99 (5th Cir. 2007)). The court also reasoned that a

lack of evidence does not entitle a petitioner to relief.  *Id.*  The district court went on to support the state court's finding:

> In the instant case, the Tennessee Court of Criminal Appeals' determination was not based solely on the fact of Van Tran's schizophrenia, but also on the lack of evidence available about Van Tran's early development.  The court noted Van Tran's abilities in contrast to his stated deficits and the possible effects of drug abuse and mental illness on his cognitive abilities.  Despite some possibility that Van Tran suffered significant adaptive deficits before age 18, the court's determination that he failed to meet his burden is neither contrary to nor an unreasonable application of clearly established precedent, or based on an unreasonable determination of facts in light of the evidence presented.  Van Tran has not satisfied the requirements to prove mental retardation and obtain habeas relief for his *Atkins* claims.

*Id.* at 75.

Next, the district court held that the state supreme court's narrowing construction of the aggravating circumstance was constitutional, because it provided specific and detailed guidance rendering the capital process susceptible to rational review.  *Id.* at 96–97.  The court also held that the state supreme court's determination that there was sufficient evidence to find that the facts of Van Tran's crime evinced "depravity of mind" was neither contrary to nor an unreasonable application of clearly established federal law and was based on a reasonable determination of the facts.  *Id.* at 98.  Regarding the ineffective-assistance-of-counsel claim, the district court held that the state appellate court did not apply the *Strickland* test unreasonably and did not rely on an unreasonable determination of the facts; the court noted that the evidence that could have been presented at trial was not significantly different from what was actually presented.  *Id.* at 103–04.

The district court granted Van Tran a certificate of appealability with respect to claim (2), that he has mental retardation, and claim (4), that the "depravity of mind" aggravating circumstance was unconstitutionally vague as applied.  *Id*. at 140–42.  Van Tran moved this court to expand the scope of this appeal, and we subsequently certified claim (7), that Van Tran received ineffective assistance of trial counsel during the penalty phase because his counsel failed to properly investigate and present all available mitigating evidence.

**II.**

**A. Standard of Review and Governing Law**

The merits of Van Tran's habeas claims are governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), under which a writ of habeas corpus may not be granted unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259 (2010).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). To obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011).

State court determinations of fact are presumed to be correct, and the petitioner bears the burden of rebutting this presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Our review under § 2254(d)(1) is limited to the record that was before the state court. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

**B. *Atkins* Claim**

The Eighth and Fourteenth Amendments prohibit the execution of intellectually disabled persons. *Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014); *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). The Supreme Court left to the individual states "the task of developing appropriate ways to enforce the constitutional restriction." *Atkins*, 536 U.S. at 317. Accordingly, the *Atkins* Court "did not provide definitive procedural or substantive guides" for enforcing the *Atkins* protection. *Bobby v. Bies*, 556 U.S. 825, 831 (2009). The Court recently elucidated this vague command:

[T]he States play a critical role in advancing protections and providing the [courts] with information that contributes to an understanding of how intellectual disability should be measured and assessed. But *Atkins* did not give the States unfettered discretion to define the full scope of the constitutional protection.

*Hall*, 134 S. Ct. at 1998. Thus, the Tennessee legislature and courts have discretion, within reason, to determine the procedures by which the Tennessee courts will ensure that persons with intellectual disability are not executed in violation of the Eighth Amendment. The Tennessee legislature and courts also have discretion to define intellectual disability substantively for the purposes of *Atkins*, but this latter discretion is limited.

Tennessee, in accordance with longstanding clinical practice, has adopted the standard definition of intellectual disability with the following three elements: "(1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below; (2) Deficits in adaptive behavior; and (3) The intellectual disability must have been manifested during the developmental period, or by eighteen (18) years of age." *State v. Pruitt*, 415 S.W.3d 180, 202 (Tenn. 2013) (quoting Tenn. Code Ann. § 39-13-203(a)); *see also Hall*, 134 S. Ct. at 2003.

The first prong of the definition of intellectual disability is not at issue, which the State concedes. The second prong was met under the reasoning of the district court, which we uphold on de novo review. Although the state court found that Van Tran had failed to meet the third prong, this was contrary to or an unreasonable application of federal law in light of intervening Tennessee law in *Coleman v. State*, 341 S.W.3d 221 (Tenn. 2011), in which the Tennessee Supreme Court explicated the role of expert testimony in a court's consideration of *Atkins* claims. Under *Coleman*'s guidance, Van Tran should be granted a conditional writ of habeas corpus in order to allow the state postconviction court to reconsider Van Tran's *Atkins* claim under the now-governing legal standard.

*First Prong: Intelligence Quotient*

With regard to the first prong, the TCCA held that Van Tran had satisfied the first prong of the test because he had proved by a preponderance of the evidence that he had a functional

I.Q. of 70 or below.  *Van Tran*, 2006 WL 3327828, at *20 (Tenn. Ct. Crim. App. Nov. 9, 2006).

The parties do not contest this issue on appeal.

*Second Prong: Adaptive Deficits*

With regard to the second prong, although the issue is close, the district court correctly found that the state court unreasonably applied the facts in arriving at the conclusion that Van Tran demonstrated only one adaptive deficit.  Overall, the TCCA reasoned in a holistic way that departed unreasonably from the reliable expert analyses used by Van Tran's experts, which were in accordance with the professionally accepted definitions provided by the statute and the clinical best practices endorsed by the Tennessee Supreme Court.  The reliable and professionally vetted methods presented by Van Tran's experts, from which the legal standards draw their substance, must guide the court's inquiry.  The postconviction trial and appellate courts' ad hoc, ostensibly commonsense reasoning, by itself, is not sufficient to reject the experts' conclusions that Van Tran has more than one adaptive deficit.

The Tennessee Supreme Court has stated generally that "deficits in adaptive behavior 'mean[s] the inability of an individual to behave so as to adapt to the surrounding circumstances.'"  *Coleman*, 341 S.W.3d at 248 (quoting *State v. Smith*, 893 S.W.2d 908, 918 (Tenn. 1994)).  In order to demonstrate deficits in adaptive behavior sufficient to satisfy the second prong of the intellectual disability test, Tennessee courts typically require the defendant to demonstrate "significant limitations" in two of the following skill areas: "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety."  *See Van Tran v. State*, 66 S.W.3d 790, 795 (Tenn. 2001) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 39 (4th ed. 1994) ("*DSM-IV*")).  This approach, as clearly set out in the *Van Tran* opinion of 2001 and borrowed from the *DSM-IV* (and its revision, the *DSM-IV-TR*), was cited with approval by the state supreme court in the recent *Coleman* opinion.  *Coleman*, 341 S.W.3d at 248–49; *see also* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 49 (4th rev. ed. 2000) (maintaining two-out-of-ten-area framework).  Similarly, in *Howell v. State*, the state supreme court intimated approval of the two-or-more-deficits approach by stating that "the most widely recognized definitions of mental

retardation include two basic characteristics: significantly subaverage intellectual functioning accompanied by related *limitations in two or more adaptive skill areas (such as self-care, communication, or social skills)*, and manifestation of the condition before age 18." 151 S.W.3d 450, 457 (Tenn. 2004) (emphasis added). Most importantly, the state postconviction courts below appeared to use this framework in analyzing Van Tran's adaptive deficits. For these reasons, although other frameworks could be used,[5] it is most appropriate in this case to adhere to the two-out-of-ten framework on habeas review of the state court's decision.

As an initial matter, it is uncontested that Van Tran suffers from deficits in communication, one of the ten areas of adaptive behavior. In order to satisfy the second prong, therefore, Van Tran had to demonstrate by a preponderance of the evidence that he suffers from a deficit in at least one of the other areas. Because we conclude, like the district court below, that it was not reasonable for the Tennessee courts to find no adaptive deficit with respect to functional academics, we need not address the remaining eight factors.

The district court correctly determined that the TCCA's "determination that Van Tran was not limited in functional academics, especially considering the court's finding that he had deficits in reading proficiency and language skills, was an unreasonable determination of fact based on the evidence presented." District Court Order at 64. The State's brief on this appeal devotes little more than a page to refuting this conclusion. Appellee's Br. at 53–54. The evidence presented in the record demonstrates that Van Tran had significant deficits in the area of functional academics. The state trial court, in an analysis adopted by the TCCA, reasoned as follows in rejecting the functional academics adaptive deficit:

---

[5]For example, the American Association on Mental Retardation changed the adaptive behavior analysis in the Tenth Edition of its manual. The Ninth Edition, released in 1992, employed the two-out-of-ten framework. *See AAMR 10th* at 25. However, the Tenth Edition, released in 2002, employed three broader categories that it deemed "are more consistent with the structure of existing measures and with the body of research evidence on adaptive behavior." *Id.* at 73. Now, the requirement of "significant limitations in adaptive behavior" has been "operationally defined as performance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, and practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills." *Id.* at 13. Although this analysis was explained by Dr. Auble and both Drs. Grant and Auble applied tests that purport to assess adaptive behavior pursuant to the Tenth Edition, *see Van Tran*, 2006 WL 3327828, at *21–23, it is sufficient for our purposes to rely solely on the two-out-of-ten test that is used most frequently by the Tennessee courts and which appeared to be the primary guide in the analysis of the state court in this case.

Finally, the court further disagrees with the assessment that petitioner suffers deficits in the area of functional academics. The court does not disagree that the petitioner has deficits in the area of reading proficiency and language skills, but finds petitioner's deficits are more in the area of communication than functional academics. Petitioner only attended school in the United States for one year, and attended school in Vietnam sporadically for a total of only two years. To the court's knowledge, no records exist from the school(s) in Vietnam. Moreover, on the one test designed to determine petitioner's functional academic level, petitioner's score was not below average. Dr. Grant testified that he administered the Kaufman Functional Academic Skills Test and petitioner's functional academic score was 79. In looking at the individual parts of the test, petitioner's math score was much higher than his reading score. Other testing seemed to indicate the same pattern. Despite the fact that these tests may indicate some academic deficit in the area of reading, this court finds it is unable to say such results indicate an overall deficit in the area of functional academics. This is especially true in light of the court's conclusion that petitioner does have deficits in communication and Dr. Grant's testimony that all of the tests were given in English without the aid of an interpreter. While[] Dr. Grant maintains the petitioner's English skills are better than his Vietnamese, this court finds this fact significant in evaluating the weight to be given to Dr. Grant's conclusions. Given the fact that the petitioner's functional academic score was 79; the fact that the petitioner may have had difficulty understanding the testing due to the language barrier; the fact that petitioner has a very limited formal education; and the fact that the only areas where petitioner showed deficiencies were in the areas involving language skills, this court finds the evidence does not establish deficits in the area of functional academics.

This discounting of expert testimony was based on the trial court's refusal to accept the expert conclusions of Van Tran's witnesses, in light of the district court's disagreement with the expert opinions as to what the tests indicated and how the test results were affected by the fact that English was Van Tran's second language. These conclusions, while perhaps reasonable in appearance to a layperson, are in the context of this case too unsupported by the record to be upheld as reasonable. The State presented no testimony to contradict the conclusions of Van Tran's experts, all of whom agreed that he suffered significant deficits in functional academics.

Dr. Adler, a nationally certified school psychologist, testified that Van Tran was "functionally illiterate" and could not, for example, comprehend a newspaper article written at a sixth-grade level. Dr. Grant, a board-certified forensic examiner and neuropsychologist, administered the Kaufman Academic Skills Test, on which Van Tran scored an arithmetic standard score of 93, a reading standard store of 66, and a functional academic score of 79. Dr.

Grant emphasized that the fact that Van Tran does not suffer a "significant deficit" in arithmetic did not change his conclusions, noting that "retarded individuals are just like the rest of us, they have strengths and they have weaknesses." Dr. Grant testified that Van Tran was reading at a fourth-grade level, and that it was important to note that he continued to read at a fourth-grade level even after eight or nine years of instruction in a G.E.D. program. Similarly, Dr. Auble concluded, based on Van Tran's plateauing at a fourth grade–level reading skill, that Van Tran demonstrates an adaptive deficit in functional academics, noting that "he really has not progressed much in terms of his functional academics despite many, many[] years of schooling."

The expert testimony explicitly refuted the concern that the tests were affected by the fact that the tests were conducted in English, Van Tran's non-native language. Dr. Grant explained in his testimony why he decided to conduct his tests on Van Tran in the English language even though Van Tran's native tongue is Vietnamese. Dr. Grant testified that Van Tran is seriously deficient in Vietnamese and that he performed no better than a child in effectively communicating in Vietnamese. Dr. Grant also noted that his colleague Dr. Wasserman, a bilingual psychologist, had determined that Van Tran's proficiency in English exceeded his proficiency in Vietnamese and that he would score higher on tests in English than in Vietnamese. A bilingual correctional officer also confirmed that Van Tran's proficiency in Vietnamese is "very low." The State presented no evidence contradicting the expert evidence that Van Tran was more proficient in English than Vietnamese.

Because the State presented no evidence to support the theory that Van Tran's tests administered in English were unreliable because they were not given in his native language, the state court unreasonably discredited the testimony of the psychologists who administered Van Tran's tests in English. Given that there are various considerations in the choice of which language to use, and that the diagnostic tests were administered and interpreted by a member of the professional group that designs and frequently applies the tests, the choice of the language in which to administer the test is reasonably within the clinical discretion of the professional administering the test. Without a contradictory analysis by another member of the profession, a court is in no position to question the professional judgment used in decisions associated with the administration of a clinical diagnostic test. This conclusion finds some support in an *Atkins* case

from the Fifth Circuit.  In *Rivera v. Quarterman*, the Fifth Circuit considered the State of Texas's argument that the intelligence tests administered to a bilingual capital defendant should have been adjusted upward to compensate for his bilingualism.  505 F.3d 349, 361 (5th Cir. 2007).  The psychiatrist who had administered the test testified that she spoke with the defendant before administering the test and had no trouble communicating with him in English.  *Id.*  In addition, other witnesses testified that they conversed with the defendant in English and without communication difficulties.  *Id.*  However, the State presented the testimony of an expert who explained that the defendant's bilingualism negatively impacted his verbal acuity and thereby artificially decreased the results of the I.Q. test administered by the defendant's expert.  *Id.*  The Fifth Circuit rejected the State's argument that the district court erred by crediting the testimony of the psychiatrist who administered the test, largely because, as Texas's own expert witness acknowledged on the stand, the ultimate decision of which language in which to administer the intelligence tests is a clinical judgment that must be made with the clinician's professional judgment.  *Id.* at 362.  In the present case, the State's argument that the tests were unreliable is even less plausible, because the State relied neither on a general theory about bilingualism nor on any expert testimony presented.

Notwithstanding the TCCA's general failure to adhere to the clinical framework, the sophistication of the crime and Van Tran's role in it are mostly irrelevant to the very narrow, clinically defined question of whether Van Tran suffers a deficit in the area of functional academics.  In *Hooks v. State*, the Oklahoma Court of Criminal Appeals held that evidence that the defendant ran a prostitution ring was admissible at an *Atkins* hearing, because a crime that involved a continuing criminal enterprise "requires a level of abstract thought, coupled with the ability to carry out plans, which might be beyond the capabilities of a mentally retarded person." 126 P.3d 636, 644 (Okla. Ct. Crim. App. 2005).  By contrast, the court noted that "individual acts of violent crime, such as armed robbery or rape, require little or no abstract thought or complex planning." *Id.*  Van Tran's murder is of the latter kind; it was impulsive, committed in the heat of a tense moment during an armed robbery performed with accomplices.  Fleeing the jurisdiction with his accomplice does not indicate forethought or planning, but rather an impulsive response to an armed robbery gone awry.  Selling the stolen goods is a fairly basic response to the desperate situation in which Van Tran and his accomplice surely found

themselves. None of these actions is so sophisticated or elaborate that the intellectually disabled could not have performed it.

Furthermore, the overemphasis on certain perceived strengths, inferred from anecdotal evidence, is inconsistent with the expert testimony and accepted professional analyses. Dr. Grant testified that "retarded individuals . . . have strengths and they have weaknesses." Indeed, one of the "essential" assumptions of the clinical definition is: "Within an individual, limitations often coexist with strengths." *AAMR 10th* at 1, 8. In *Black v. Bell*, we noted expert testimony that "someone might be mentally retarded but still be able to carry out any of a number of everyday activities, such as maintaining a simple job or driving a car." 664 F.3d 81, 99 (6th Cir. 2011). Thus, we held that, in light of the expert testimony presented, "[a] full, independent review of whether [the petitioner] showed . . . that he displayed adaptive deficits . . . must therefore look at his weaknesses instead of at his strengths." *Id.*; *see also United States v. Davis*, 611 F. Supp. 2d 472, 499, 501 (D. Md. 2009).

The irrelevance of Van Tran's criminal conduct to functional academics is consistent with the TCCA's decision in *Howell v. State*, No. W2009-02426-CCA-R3-PD, 2011 WL 2420378 (Tenn. Ct. Crim. App. June 14, 2011). In affirming the postconviction trial court's finding that the defendant did not exhibit at least two deficits in adaptive behavior, the appellate court accepted that "the facts and circumstances of Petitioner's convictions reflect that Petitioner adapted and adjusted to his surroundings throughout the course of his three state crime spree," *id.* at *19, and upheld the trial court's use of anecdotal evidence to contradict the expert conclusions about "additional deficits in adaptive behavior," *id.* at *18. However, the appellate court did not use this assessment to contest the expert testimony presented to demonstrate deficits in academic functioning. *See id.* Rather, the trial court had accepted the experts' findings that there were deficits in "academic functioning" and used the anecdotal evidence to counter "claims of additional deficits," for which "the testing was done retroactively and was contradicted by Petitioner's conduct." *Id.* The most natural reading of the *Howell* decision supports the use of relevant anecdotal evidence to contradict specific findings regarding individual adaptive deficits, especially where there is a dearth of directed expert testimony regarding those deficits. Here, although Van Tran's crime and ensuing actions could provide useful data points in assessing

adaptive behavior deficits, the persuasive expert testimony that Van Tran suffered a deficit in the area of functional academics was not contradicted by the facts of his conviction.

The foregoing does not undermine the court's ultimate decision-making role. As the Supreme Court said in *Kansas v. Crane*, 534 U.S. 407, 413 (2002), "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law." However, where lawmakers deliberately incorporate clinical standards into legal definitions, the courts strain the limits of reasonableness by rejecting expert opinions based exclusively on the courts' own inexpert analysis. Although "the trial court is not required to follow the opinion of any particular expert," it "must give full and fair consideration to all the evidence presented." *Coleman*, 341 S.W.3d at at 242. The Tennessee Supreme Court has emphasized the importance of clinical judgment in guiding the courts to overall more accurate and consistent decisions. *See id.* at 246–47.

Because the postconviction courts performed an analysis in terms of these ten areas of adaptive deficits, which it borrowed from the methods used by the expert witnesses, our review utilizes the same framework. Adherence to some chosen clinical framework, even if such adherence is not rigid, appears to be required by Tennessee law. In a comprehensive review of the state supreme court's previous decisions interpreting § 39-13-203, the *Coleman* court stated that one of the principles guiding the application of the statute is that "[t]he Court's application of the statute may be guided and informed by the clinical standards, criteria, and practices customarily used to assess and diagnose intellectual disability." *Coleman*, 341 S.W.3d at 240 (citing *State v. Strode*, 232 S.W.3d 1, 14 (Tenn. 2007)). Although the use of the term "may" appears permissive, the state supreme court in the same opinion communicated a strong policy in favor of employing clinical definitions, supplied necessarily by experts in the field of intellectual disability, when it stated that "[a]ligning the application of the statute with the clinical approach to diagnosing and assessing intellectual disability will result in more accurate and consistent decisions." *See id.* at 247.

Indeed, the state supreme court has consistently indicated that the clinical definitions, although not binding, have a close semantic relationship to the statutory definition. For example, the *Van Tran* opinion of 2001 stated that the Tennessee courts refer to the *DSM-IV* framework

for assessing adaptive deficits "for the purpose of providing insight and background into mental retardation," although not strictly "for the purpose of expanding upon or interpreting the statutory definition in Tennessee." 66 S.W.3d at 795 n.4. Citing this statement with approval, the *Coleman* court stated: "Tennessee courts have thus relied on this [clinical] definition to better understand what the Tennessee Code means by addressing deficits in adaptive behavior." 341 S.W.3d at 248 n.86. The ten-area framework from the *DSM-IV* was cited with approval yet again in the Tennessee Supreme Court's most recent decision expounding § 39-13-203, which called the *DSM-IV*'s ten-area framework "[t]he accepted clinical definition of adaptive functioning." *State v. Pruitt*, 415 S.W.3d 180, 204 (Tenn. 2013). The most reasonable reading of these various propositions is that the courts should be guided, though not constricted, by the two-out-of-ten-area clinical definition from the *DSM-IV*.

More importantly, the court must assess adaptive deficits in light of the expert testimony presented by the parties. The trial court "must give full and fair consideration to all of the evidence presented," especially the testimony of experts who "bring to bear and utilize reliable practices, methods, standards, and data that are relevant in their particular fields." *Coleman*, 341 S.W.3d at 242. Although not mandating any particular analysis for adaptive deficits, the state supreme court in *Coleman* found that the trial court committed reversible error by distinguishing causally between intellectual disability and mental illness where that distinction was not supported by expert evidence, and hence there "was error in light of the evidence presented by" the defendant's expert witnesses. *Id.* at 251–52. Because "[t]he State presented no contrary evidence," there was "simply no sufficient basis *on the present record* to" make the conceptual distinction the court made. *Id.* at 252 (emphasis added).

The Tennessee Supreme Court's recent decision in *State v. Pruitt*, 415 S.W.3d 180 (Tenn. 2013), reinforces the proposition that "full and fair consideration" of expert testimony requires the trial court to treat as dispositive expert testimony establishing and utilizing methods of analysis that is uncontradicted by other expert testimony. In that case, two of the defendant's experts testified that his I.Q. was below seventy. *Id.* at 202–03. One of the experts testified that a raw score of of sixty-six might have been slightly below the defendant's true level of cognitive functioning because the defendant did not appear to take the test seriously; and the other expert

noted that the defendant, answering hastily, might not have thought through all of the questions. *Id.* at 203. And "[a]lthough both experts stated that Mr. Pruitt may not have given his best effort on the tests, neither testified that Mr. Pruitt's I.Q. would have been higher than seventy if his effort had been greater," and "[n]either expert testified that Mr. Pruitt's test scores were 'unreliable.'" *Id.* The trial court nonetheless "found that neither [test score] was the product of Mr. Pruitt's best efforts and that his grades in school and [state achievement test] scores indicated that the . . . test scores were unreliable." *Id.* at 200. The Tennessee Supreme Court reversed this finding, distinguishing between the experts' speculative asides about the test administration and the considerations that actually contributed to the experts' final conclusions:

> . . . Although the scores in this case were called into question by the trial court, neither expert opined that Mr. Pruitt's I.Q. was greater than seventy, whether through lack of effort or on some other basis for adjustment of the raw score. Neither expert testified that the tests had an element of unreliability in their administration.
>
> Under these circumstances, we are unwilling to uphold a finding that the tests are of no value in determining whether Mr. Pruitt has met his burden in showing that his I.Q. is seventy or below . . . . The evidence showed that Mr. Pruitt had I.Q. test scores below seventy. In the absence of expert testimony that his I.Q. was above seventy, we hold that the evidence preponderates against the trial court's determination that Mr. Pruitt failed to prove that he had significantly subaverage general intellectual functioning as evidenced by a functional I.Q. of seventy or below.

*Id.* at 203. This analysis further supports *Coleman*'s implication that a trial court in Tennessee cannot disregard reliable expert opinions on the issue of intellectual disability when those opinions are based on clinically sound and professionally accepted methods and there is no other expert testimony that supports an analysis leading to a contrary conclusion.

It follows from the above discussion that Tennessee law does not permit the state trial court to use its independent judgment to disregard uncontroverted expert analyses, consider factors that the experts have testified are unreliable, or declare to be dispositive a factor irrelevant to the clinical definitions employed by the experts. At one point, the Tennessee Supreme Court declined to define in a careful and delineated form the term "adaptive deficits," stating that the term should be construed in a commonsense way as "the inability of an individual to behave so as to adapt to surrounding circumstances." *State v. Smith*, 893 S.W.2d 908, 918

(Tenn. 1994). But more recently, the court has turned toward reliance on expert analysis. With respect to intellectual functioning, the *Coleman* court stated that, for example, "[a]scertaining a person's I.Q. is not a matter within the common knowledge of lay persons," and concluded that "[e]xpert testimony in some form will *generally be required* to assist the trial court in determining whether a criminal defendant is a person with intellectual disability." *Coleman*, 341 S.W.3d at 241 (emphasis added). Adaptive deficits are similarly outside the ken of the lay judge. The *Coleman* court, as it did with I.Q., emphasized reliance on expert analysis: "Notwithstanding *State v. Smith*, Tennessee's trial and appellate courts have repeatedly relied upon expert analysis of adaptive behavior or functioning predicated upon definitions advanced within the relevant medical and psychological community and authoritative texts such as the AAIDD Manual and the DSM-IV in determining whether the second prong has been satisfied." *Id*. at 248.

This construction of Tennessee law under *Coleman* is buttressed by the United States Supreme Court's recent opinion in *Hall v. Florida*, 134 S. Ct. 1986 (2014), which clarified the minimum *Atkins* standard under the U.S. Constitution (whereas *Coleman* interpreted state constitutional and statutory law). In *Hall*, the Court reasoned that the Constitution requires the courts and legislatures to follow clinical practices in defining intellectual disability. In that case, the Court confronted directly the question of "how intellectual disability must be defined in order to implement the[] principles and the holding of *Atkins*." *Id.* at 1993. The Court emphasized that "[s]ociety relies upon medical and professional expertise to define and explain how to diagnose the mental condition at issue," for a variety of important legal determinations not limited to the death penalty. *Id.* The Court held that Florida's strict I.Q. cutoff of 70 was unconstitutional, in part because it "disregard[ed] established medical practice." *See id.* at 1995. This decision supports the position of the Tennessee Supreme Court that "the courts would make these fact-intensive and complex decisions with the assistance of experts in the field." *Coleman*, 341 S.W.3d at 244.

In light of the methods and analyses employed by the expert witnesses, the TCCA unreasonably determined that Van Tran was not intellectually disabled. The TCCA emphasized too heavily in its analysis the facts of the crime, which are not relevant to the analysis of most of

the areas of adaptive behavior, especially that of functional academics. The TCCA also incorporated by reference the analysis of the state postconviction trial court, which undertook a careful analysis within the ten-area framework. That analysis, as incorporated by the TCCA, was reasonable except with respect to the area of functional academics.

The district court thus properly determined, notwithstanding AEDPA deference, that Van Tran suffers from deficits in two of the ten areas of adaptive behavior, thereby satisfying the second prong of the statutory definition of intellectual disability.

*Third Prong: Early Onset*

Because under the now-prevailing standards for adjudicating claims of intellectual disability the TCCA used an erroneous causation analysis with respect to the third prong of early onset, Van Tran is entitled to habeas relief conditioned on a new evidentiary hearing before the state trial court. In particular, the postconviction hearing given to Van Tran did not meet the retroactively applicable substantive and procedural standards set forth by the Tennessee Supreme Court in *Coleman v. State*, 341 S.W.3d 221 (Tenn. 2011).

The state postconviction court ruled that there was no onset of intellectual disability during the developmental period despite strong evidence of pre-age-eighteen intellectual and adaptive deficits. Two board-certified experts in psychology, both trained and experienced in intellectual disability, testified about Van Tran's early developmental challenges, which stemmed from his early childhood and continued through his arrival in the United States shortly before he turned eighteen. *Van Tran*, 2006 WL 3327828, at *2–12. Dr. Grant discussed how Van Tran was late in important developmental milestones: he was not toilet-trained until five years of age, did not speak until the age of six, and reportedly never advanced with his Vietnamese language skills beyond those of a five-year-old child. *See id.* at *4–5. Dr. Grant testified that Van Tran's most recent testing was consistent with prior achievement tests, and that his neurological impairment and intellectual deficiencies would have been stable over the course of his adult life, even despite the presence of schizophrenia in late adolescence. *See id.* at *6. Dr. Auble's testimony presented a compelling enumeration of circumstances in Van Tran's childhood that made it likely that Van Tran would have developed his neurological impairments before the age of eighteen:

Dr. Auble stated that the evidence indicates that the impairments appeared during the Petitioner's developmental period. In this regard, she stated that the Petitioner's life history indicates a number of risk factors that would have contributed to his mental retardation. Using a table listing various potential risk factors for mental retardation provided in the Tenth Edition of the AAMR, Dr. Auble proceeded to enumerate those factors applicable to the Petitioner. First, the Petitioner's mother had poor prenatal care. The Petitioner's mother suffered from a fall while she was pregnant resulting in "some bleeding and some other injuries . . . ." The Petitioner's mother "smoked about a half a pack a day at the time she was pregnant with him." The Petitioner's mother is "probably relatively limited in intelligence." The Petitioner did not have medical treatment while he lived in Vietnam. As a child, he had malnutrition and reportedly had seizures. The Petitioner had traumatic brain injuries. The Petitioner also lacked adequate stimulation and experienced family poverty. His living situation was essentially homeless. During his childhood, he only attended school for two years. The Petitioner suffered child abuse and neglect. The Petitioner had no consistent caretakers or friends. His mother was a single parent, and the Petitioner did not really know his father. The Petitioner did not speak until he was six years old, and, when he did speak, his speech was abnormal. Presently, the Petitioner has speech impairments in both Vietnamese and English. The Petitioner was a poor student, although he did have good attendance. "These findings indicate that there was brain dysfunction that was present in childhood as well as present now." Dr. Auble summarized, ". . . he had an impaired mother. He had lack of support from his family. He had abuse, poverty, war, discrimination . . . , early drug and alcohol abuse. All of this contributed to his compromised functioning during childhood."

*Id.* at *11. Both Drs. Grant and Auble noted that Van Tran's early onset is corroborated by the academic difficulty he experienced during the year he spent in the Memphis school system, where he scored poorly on achievement tests and was slow to learn English in relation to similarly situated peers. *Id.* at *4–6, 12. The State offered no expert testimony to rebut Van Tran's experts' testimony establishing that Van Tran suffered from significant intellectual and adaptive deficits from as early as his childhood in Vietnam.

The state trial court nonetheless found that Van Tran had not met his burden with respect to this third prong. The court relied substantially on the absence of any test of intellectual functioning before the age of eighteen. With respect to Van Tran's late speech development, the court declined to attribute it to early-onset intellectual disability because "there could be a multitude of reasons why, as a child, petitioner did not speak or only spoke in a limited fashion." The court similarly found that late toilet training could have been the result of a lack of

instruction rather than neurological deficit, and that his sporadic school attendance and life on the streets could have caused his poor school performance. The court also found that "it is just as likely that any deficits in intellectual functioning occurred as a result of [paranoid schizophrenia], and thus, did not develop until after the age of eighteen." The trial court summed up:

> In this case there are no school records, no medical records, very little documented social history and the observations of the experts on this point are speculative at best. Additionally, there is evidence that tends to establish a legitimate alternative explanation for the petitioner's below average I.Q. scores. Admittedly, Dr. Kenner could not say for sure how the petitioner would be [a]ffected. However, neither Dr. Grant nor Dr. Auble could say definitively that the disease had not [a]ffected petitioner's neurological functioning.
>
> Having determined that, in light of the proof presented, it is not possible to discern when the petitioner's deficits in intellectual functioning developed, this court finds petitioner has also failed to meet his burden with respect to the third prong of the statute.

The TCCA affirmed. The TCCA relied on the absence of pre-age-eighteen testing and the possibility that Van Tran's deficits were caused by substance abuse or schizophrenia instead of impaired brain functioning. Moreover, the court held that "[t]he evidence of poverty, child abuse, lack of education, family dysfunction and poor social conditions are not enough to demonstrate that any deficits manifested during the developmental period." *Van Tran*, 2006 WL 3327828, at *26. The TCCA thus upheld the postconviction court's rejection of the expert evidence of Drs. Auble and Grant.

This conclusion is unreasonable, but only in light of the Tennessee Supreme Court's intervening opinion in *Coleman*.

It was unreasonable for the TCCA to conclude in this case "that the fact that the Petitioner admits to alcohol and drug abuse and the fact that he has been diagnosed with schizophrenia may have impaired his brain functioning." *Van Tran*, 2006 WL 3327828, at *26. Under *Coleman*, it is not appropriate to separate neurological deficit from mental disorder as causes when determining whether a defendant actually suffers from cognitive and adaptive deficits, when the petitioner presents expert testimony to the contrary and the State does not rebut with its own experts. *Coleman*, 341 S.W.3d at 252; *see also State v. Pruitt*, 415 S.W.3d

180, 203 (Tenn. 2013) (holding that lower court's finding I.Q. tests were unreliable was erroneous, in light of the fact that no expert testified that they were unreliable).

Furthermore, because the TCCA did not thoroughly address its reasoning about the impact of schizophrenia on Van Tran's deficits, the court appears to have adopted the postconviction trial court's erroneous determination that Van Tran's cognitive functioning deteriorated as a result of suffering from *untreated* schizophrenia for seven years. This conclusion appeared to rely on the determination that Van Tran's first treatment began when he was diagnosed by a Dr. Kenner in 1997, who also indicated at that time that Van Tran might have begun suffering from schizophrenia as early as 1989. However, the record clearly indicates that a Dr. Humble diagnosed Van Tran with schizophrenia in 1990, and that Van Tran began to be treated with medication in that same month. Thus, the TCCA could not have relied on the state trial court's findings that Van Tran suffered from a long length of untreated schizophrenia and that his functioning may have deteriorated during that period of no treatment. Indeed, because Van Tran's treatment began so early, the conclusion that Van Tran's schizophrenia somehow tends to disprove early onset is undermined by Dr. Auble's testimony that when schizophrenia is treated, "I.Q. scores do not decline and can, in fact, improve." *Van Tran*, 2006 WL 3327828, at *10. Indeed, these corrections to the state trial court's analysis imply the opposite of the state trial court's conclusions. That is, because Van Tran's standardized test scores may have improved with treatment, the fact that he continues to suffer from deficits even now after a period of improvement implies that he also suffered the deficits in the past, before the improvement. Thus, the TCCA's causal analysis with respect to Van Tran's schizophrenia is unreasonable factually as well as legally.

Similarly, regardless of whether *Coleman* would strictly forbid a causal analysis that separates out permanent impairments caused by drug and alcohol abuse, such an analysis is not reasonably supported by expert testimony in the record. There is no expert testimony regarding how a history of drug or alcohol abuse may have contributed to post-developmental impairment. In light of the facts and the expert testimony, the TCCA's conclusion that alcohol and drug abuse may have permanently caused or substantially contributed to Van Tran's cognitive and adaptive deficits in the three years between his eighteenth birthday and when he was incarcerated—the

only time that any testimony establishes he had access to drugs and alcohol in his adult life—appears unlikely. Van Tran had begun abusing drugs and alcohol at a young age, so much of his drug and alcohol abuse probably occurred prior to his eighteenth birthday. Indeed, Dr. Auble suggested that early drug and alcohol abuse may have actually contributed to the manifestation of deficits before the age of eighteen. Thus, the TCCA's causal analysis was also flawed with respect to Van Tran's history with drug and alcohol abuse.

Further, the state court committed an error under *Coleman* by not giving "full and fair consideration" to the expert testimony regarding "risk factors." *See* 341 S.W.3d at 242. The TCCA misconstrued the experts' testimony by interpreting the presence of "risk factors" as a concession that Van Tran could not demonstrate that he actually was mentally retarded. *See* 2006 WL 3327828, at *26. The state court's analysis conflated the issue of whether there are adaptive deficits with the related but distinct issue of distinguishing their causes:

> The only proof establishing this third prong were reliance upon social factors present in the Petitioner's childhood, including extreme poverty and child abuse. In this regard, we cannot conclude that the trial court's conclusion that the Petitioner's late development could have been the result of "neglect" rather than neurological deficit was in error or contrary to the evidence. The evidence of poverty, child abuse, lack of education, family dysfunction and poor social conditions are not enough to demonstrate that any deficits manifested during the developmental period.

*Id.*

There are two critical errors with this characterization of Van Tran's case for early onset.

First, the state court mischaracterizes the nature of Van Tran's proof; contrary to what the TCCA stated, the presence of risk factors were not the "only proof" of intellectual disability during the developmental period. There was substantial real evidence of deficits being manifested before Van Tran reached the age of 18: his poor achievement tests in school in the United States, administered at the age of 17, which Dr. Adler opined "likely reflect an overestimate of his actual abilities"; the testimony of Van Tran's mother that he was late in arriving at important developmental milestones, for instance, Van Tran did not speak until he was six; and the testimony of Dr. Grant that Van Tran's early intellectual deficits could be inferred from his present subaverage I.Q. level because "I.Q. is usually, fairly consistent over

time." These forms of evidence, which arise directly or indirectly from Van Tran's actual pre-age-eighteen behavior, constitute real proof of early onset rather than mere observations about his environment. *See In re Mathis*, 483 F.3d 395, 399 (5th Cir. 2007). The state court incorrectly interpreted the experts' "risk factor" analysis as a foundation of proof, rather than as an additional method of explaining, corroborating, and reinforcing their conclusion that Van Tran started suffering deficits in intellectual functioning and adaptive behavior at a young age.

Second, the state court committed a *Coleman* error by using the "risk factors" presented by Van Tran's experts to dismiss intellectual disability as the cause of any deficits that were manifested during Van Tran's childhood. That is, the state court appears to have interpreted the presence of risk factors as proof that the cause of any deficits was "neglect" rather than "neurological deficit." *See Van Tran*, 2006 WL 3327828, at *26. This is an error under *Coleman*, in which the Tennessee Supreme Court held that a court commits legal error when it makes causal distinctions in the absence of expert testimony supporting the court's causal analysis. *See* 341 S.W.3d at 252. In *Coleman*, the state supreme court relied exclusively on the expert testimony on record to support the court's causal analysis. The experts in *Coleman* "concluded that, along with organic brain disorder and environmental factors, mental illness provided an aggravating factor joining together to limit Mr. Coleman's adaptive functioning." *Id.* Similarly, Van Tran's experts testified that environmental factors as well as neurological deficits contributed to Van Tran's adaptive and intellectual deficits. Just as in *Coleman*, the State presented no expert testimony to contradict Van Tran's experts' causal analysis, and therefore "[t]here is simply no sufficient basis *on the present record* to separate the impact of mental illness and intellectual disability in assessing [the defendant's] deficits in adaptive behavior." *Id.* (emphasis added). The *Coleman* court found that, because it could not "conclude beyond a reasonable doubt that the lower courts' erroneous causation analysis did not have a substantial and injurious impact on their determination that Mr. Coleman failed to carry his burden of establishing deficits in adaptive behavior," the error was not harmless. *Id.* For the same reasons, the TCCA's erroneous reliance on a causal analysis unsupported by expert testimony on the record had a substantial and injurious impact on its final determination that Van Tran is not intellectually disabled.

The district court below correctly pointed out that "[a]n expert's testimony that an individual is 'at risk' of mental retardation because of congenital factors, poverty, and abuse is not enough to support an *Atkins* claim." District Court Order at 74 (citing *In re Mathis*, 483 F.3d at 398–99). But Van Tran presented more than just expert testimony that he was "at risk" of intellectual disability at a young age. Van Tran's experts testified that Van Tran *actually was* intellectually disabled under the statutory definition, which necessarily includes a finding that his intellectual and adaptive deficits were manifested in the developmental period. Dr. Grant stated in his report, "It is my professional opinion that Heck Van Tran is functioning within the mentally retarded range as defined by Tenn. Stat. Ann. § 39-13-203 in that he has subaverage intellectual functioning as evidenced by an I.Q. of 70 or below; he has deficits in adaptive behavior . . . and both were manifested before the age of eighteen." Dr. Auble concluded in her report, "It is my professional opinion that Mr. Tran met the criteria for mental retardation at the time of the offense. There is evidence that Mr. Tran's functioning has been impaired since childhood, and that it continues to be impaired at present."

*Coleman* is applicable in this case notwithstanding the State's argument that it does not apply. We are bound by our published decision in *Black v. Bell* to consider *Coleman* retroactively in our review of an *Atkins* claim under AEDPA. 664 F.3d 81, 92 (6th Cir. 2011). The defendant in *Black* claimed that his sentence of death was unconstitutional under *Atkins*, and he challenged in federal habeas proceedings the decision of the TCCA denying postconviction relief. After oral argument in the Sixth Circuit, the Tennessee Supreme Court released its decision in *Coleman*, which the panel characterized as "a significant decision explaining the *Atkins* standard under Tennessee law." *Id.* at 91. Because "[t]he rules governing what factors may be considered in determining whether a defendant qualifies as mentally retarded under *Atkins* deal with questions of law," the court concluded that "[t]he TCCA's assessment of Black's level of intellectual and adaptive functioning was . . . contrary to *Coleman* under AEDPA's legal standard." *Id.* at 100. We held that, because the state court's analysis regarding intellectual disability contradicted the governing law, de novo review of the issue was required. *Id.* at 97 (citing *Fulcher v. Motley*, 444 F.3d 791, 799 (6th Cir. 2006), and *West v. Bell*, 550 F.3d 542, 553 (6th Cir. 2008)). But the court "refrain[ed] from reaching any independent conclusions . . . because no court ha[d] yet analyzed Black's *Atkins* claims according to the proper legal

standard, which was set out by the Tennessee Supreme Court in *Coleman*."  *Id.* at 101.  We vacated and remanded to the district court "to review the record based on the standard set out in *Coleman*."  *Id.*; *see also Black v. Colson*, No. 3:00-0764, 2013 WL 230664 (M.D. Tenn. Jan. 22, 2013) (conducting the independent analysis on remand).

Contrary to the State's argument, the Tennessee Supreme Court's holding in *Keen v. State* that "*Coleman*'s holding . . . was not a constitutional ruling," 398 S.W.3d 594, 609 (Tenn. 2012), does not affect *Black*'s holding.  First, the court in *Keen* was presented with a different issue in a different procedural context.  The court in that case was determining whether the decision in *Coleman* could be grounds for reopening a case under Tenn. Code Ann. § 40-30-117(a)(1), which permits a motion to reopen on the basis of "a final ruling of an appellate court establishing a constitutional right."  *See Keen*, 398 S.W.3d at 608.  In contrast, here we are presented with determining what is "clearly established federal law" for the purposes of a petition for relief under § 2254.  *Coleman* can still change the governing applicable law even if it does not assert a new constitutional right under Tennessee law.  Second, the holding in *Black* does not rely upon the constitutional status of *Coleman*.  Rather, the court in *Black* characterized *Coleman* merely as "a significant decision *explaining* the *Atkins* standard under Tennessee law," 664 F.3d at 91 (emphasis added), and one that "*elucidates* Tennessee's interpretation of *Atkins*'s *legal* standard," *id.* at 92 (first emphasis added).  Indeed, the Tennessee Supreme Court in *Keen* characterized *Coleman*'s relationship to *Van Tran* and *Atkins*'s constitutional right in a similar way, stating that *Coleman* "concerned the interpretation of Tenn. Code Ann. § 39-13-203" and that it "supplemented" and "clarified" previous case law.  *See* 398 S.W.3d at 608.  In this way, *Keen* actually supports *Black*'s reading of *Coleman*'s effect on Tennessee law.

Furthermore, the Tennessee Supreme Court itself has applied *Coleman* retroactively to review proceedings that occurred before *Coleman*.  In *State v. Pruitt*, the court relied on *Coleman* to reverse a finding that the defendant did not have an I.Q. of seventy or below, even though the trial court's decision came out "nearly two years before [the court] clarified in *Coleman* the process and criteria a trial court should use" to adjudicate an *Atkins* claim.  415 S.W.3d at 203.  Thus, *Black*'s retroactive application of *Coleman* is also consistent with Tennessee law, which

provides the procedural law that governs Van Tran's *Atkins* claim.  *See Bobby v. Bies*, 556 U.S. 825, 831 (2009).

*Black*'s holding that this court may grant relief based upon *Coleman* applies to this case, because this case is in relevant ways procedurally identical to *Black*.  Both cases involve *Atkins* claims in Tennessee.  In both cases, the TCCA denied postconviction relief and the federal district court denied habeas relief based on the TCCA's decision before *Coleman* was decided.  In both cases, *Coleman* was decided before the district court was able to fully consider the case.  Thus, as in *Black*, we have a situation in which *Coleman* intervened in between the decision of the district court and consideration by this court, changing the governing law regarding the standards by which *Atkins* claims in Tennessee are decided.

As indicated above, in *Coleman*, the defendant appealed the denial of postconviction relief in the state courts.  341 S.W.3d at 224.  He had presented testimony by two expert witnesses to establish an *Atkins* claim under Tennessee's statutory definition of intellectual disability, while the State presented no contrary evidence.  *Id.* at 227.  The state supreme court declined to decide the proper approach to determine whether a defendant has demonstrated deficits in adaptive behavior, *see id.* at 251–52 & n.93, but rather held more narrowly that "distinguishing causally between intellectual disability and mental illness in the present case was error in light of the evidence presented" by the two experts, *id.* at 252.  Although "the trial court is not required to follow the opinion of any particular expert," it "must give full and fair consideration to all the evidence presented."  *Id.* at 242.  Furthermore, in formulating their opinions, "experts may bring to bear and utilize reliable practices, methods, standards, and data that are relevant in their particular fields."  *Id.*  The court remanded so that the State could challenge the admissibility of the petitioner's experts' testimony and present additional expert testimony to counter the petitioner's.  *Id.* at 253.

In light of *Coleman*'s enunciation of the proper legal standard by which to evaluate *Atkins* claims, the TCCA's decision did not apply the proper legal standard and was therefore contrary to clearly established governing law for the reasons given above.  It is sufficient to draw relevant comparisons between this case and *Coleman* to demonstrate how the TCCA erred here.  Like *Coleman*, the State presented no expert testimony to contradict the analysis of Van Tran's

experts. Like *Coleman*, the TCCA relied upon the presence of various factors that may have contributed to Van Tran's deficits in intellectual functioning and adaptive behavior in order to cast doubt on experts' opinion that intellectual disability caused these deficits. In both cases, "[b]ased upon the evidence presented" by the expert testimony, these factors are "simply too intertwined in cause and effect for such unraveling." *See Coleman*, 341 S.W.3d at 252. It is inappropriate in light of the expert testimony to treat "mental illness and intellectual disabilities as separate dichotomous spheres rather than as interwoven causes." *See id.* at 249.

Similar to the TCCA's decision that was under review in *Black v. Bell*, here "the record is rife with conflicting testimony" regarding onset, and "[t]he TCCA's decision is of little help because the court made so few definitive factual determinations leading up to its ultimate conclusion" that Van Tran did not show onset by a preponderance of the evidence. 664 F.3d at 100. Because it is at least clear that the TCCA's decision was not entirely consistent with *Coleman*, the TCCA's assessment of Van Tran's intellectual and adaptive functioning prior to the age of 18 was contrary to *Coleman*.

*The Nature of the Remand*

This case presents a unique circumstance in that the constitutional protection depends on the content of state law that has changed retroactively since the relevant state court ruled, and the relevant state court ruled unreasonably in light of the change. Deference to the state court's ability to apply its own law first, even where such application is compelled by the U.S. Constitution, suggests that the proper course at this stage is for the district court to grant a writ of habeas corpus prohibiting imposition of the death penalty, conditioned upon the fresh determination by the Tennessee courts whether Van Tran is intellectually disabled under the clarified principles set out in *Coleman*.

Such relief is consistent with our "broad discretion in conditioning a judgment granting habeas corpus relief, [to] dispose of habeas corpus cases 'as law and justice require.'" *Pickens v. Howes*, 549 F.3d 377, 382 (6th Cir. 2008) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987)). Here, the defendant's *Atkins* claim was not adjudicated under the governing legal standard, under which the enforcement of the substantive constitutional prohibition is inextricably intertwined with certain evidentiary and procedural considerations governed by state

law. When a constitutional error may be cured by further state proceedings, the common course is to grant the writ of habeas corpus conditional upon the state court's correcting the error. *See Gentry v. Deuth*, 456 F.3d 687, 692 (6th Cir. 2006).

This relief is consistent with the relief provided in *Coleman* itself. The *Coleman* court remanded to the state postconviction trial court for a new hearing under the standards enunciated in the case, and that hearing included the more robust, adversarial consideration of expert testimony in the final determination. *See* 341 S.W.3d at 253. The *Coleman* court permitted the State to correct its failure to present expert testimony to challenge the clinical analyses of the defendant's experts. The court stated that "[o]n remand, the State may challenge the admissibility of [the defendant's experts'] testimony, present expert testimony countering [those experts'] methods or conclusions on this issue, or do both." *Coleman*, 341 S.W.3d at 253. The *Coleman* court appeared to believe that it was important for the State to have an opportunity to correct a procedural mistake that the court was only then enunciating. Similarly, the State in Van Tran's hearing before the state postconviction court occurred before *Coleman* came out, and the State did not act with the benefit of knowing the procedural implications of *Coleman*'s rules, which are now retroactively applicable to that proceeding. In fashioning relief for Van Tran in this case, we, like the *Coleman* court, should also take into consideration the State's interest in being able to correct a flaw in its case against Van Tran that it might not have been able to foresee.

Moreover, the procedural principles of *Atkins* suggest that the state postconviction trial court would be the most appropriate venue for de novo consideration under the new governing rules. Where a predominantly procedural mistake is made in a previous proceeding and the constitutionally required process must start anew, it is proper to let the court that would normally get the first crack at the issue take it up again. In *Bobby v. Bies*, the state court's consideration of the defendant's intellectual disability in a previous proceeding did not comply with *Atkins*. *See* 556 U.S. 825, 831–32 (2009). The Supreme Court reversed the federal district court's grant of habeas relief pursuant to *Atkins*, reasoning that it was inappropriate to disrupt the state court's *Atkins* proceedings. *See id.* at 837. The Court stated that "[r]ecourse first to [state] courts is just what this Court envisioned in remitting to the States responsibility for implementing the *Atkins*

decision." *Id.* Like the state court in *Bobby v. Bies*, Tennessee is poised to offer the necessary relief of a new *Atkins* hearing.

We recognize that in *Black* we remanded to the district court with instructions to "review the record based on the standard set out in *Coleman* and consistent with [the *Black*] opinion." 664 F.3d at 101. In *Black*, however, the State had presented contrary expert evidence that could be evaluated by the federal court. *Id.* at 89. In contrast, in this case as in *Coleman* itself, the State—unaware of the as-yet-undecided *Coleman* case—essentially presented no expert testimony. Because of this difference, the remedy provided in *Black v. Bell*, a remand to the district court for de novo consideration of the *Atkins* issue, would likely not achieve the optimal balance between Van Tran's and the State's separate interests in relitigating under the new *Coleman* principles.

That is, it is necessary, as it was in *Coleman*, to fashion a remedy that allows the State to make the showing that *Coleman* now requires. A remand to the district court to consider the *Atkins* claim under the *Coleman* standard might not allow the State to present evidence, if it were determined that Van Tran was not independently entitled to a hearing. As a general matter, the district court could hold some form of evidentiary hearing to allow Van Tran to present additional evidence to support his claim. *See, e.g.*, *Jackson v. Norris*, 615 F.3d 959, 962–64 (8th Cir. 2010). And AEDPA did not change the "basic rule" that "the decision to grant an evidentiary hearing [is] generally left to the sound discretion of district courts." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Townsend v. Sain*, 372 U.S. 293, 313 (1963)). When a court performs an independent review of a claim, like this, it may conduct an evidentiary hearing pursuant to the AEDPA's hearing section, 28 U.S.C. § 2254(e), in order to permit the petitioner to present additional evidence. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1412 (2011) (Breyer, J., concurring); *see also Burgess v. Comm'r, Ala. Dep't of Corr.*, 723 F.3d 1308, 1321–22 (11th Cir. 2013) (reversing denial of request for evidentiary hearing on *Atkins* claim); *Allen v. Buss*, 558 F.3d 657, 665 (7th Cir. 2009) (same). However, § 2254(e)(2) and prior case law discussing the court's basic discretion to hear new evidence do not appear to contemplate the peculiar situation in which the State would request an evidentiary hearing to develop in federal court its case that had not been fully developed in the state court. Tennessee, especially in light

of the court's remand order in *Coleman*, is unquestionably capable of providing procedural relief for both Van Tran and the State. Thus, a balanced retroactive application of *Coleman* logically requires a conditional writ in the context of this case.

**C. Challenge to the "Heinous, Atrocious, or Cruel" Aggravating Circumstance**

Van Tran argues that the "depravity of mind" aggravating circumstance in Tenn. Code Ann. § 39-2-203(i)(5) (1982) (now codified in § 39-13-204(i)(5) (2011)), as applied in this case, is unconstitutionally vague. He maintains that the state court's decision unreasonably applied *Proffitt v. Florida*, 428 U.S. 242 (1976), and was contrary to *Bell v. Cone*, 543 U.S. 447 (2005). In a footnote, Van Tran argues that the evidence was insufficient to support the jury's verdict that Kai Yin Chuey's murder showed depravity of mind beyond a reasonable doubt. Because there was sufficient evidence for a reasonable factfinder to find that Van Tran evidenced depravity of mind under the state supreme court's constitutionally permissible narrowing construction, the district court's denial of Van Tran's petition on this ground must be upheld.

The penalty phase jury sentenced Van Tran to death based on the trial court's aggravating-factor instruction that the murder must be found to have been "especially cruel in that it involved depravity of mind." *State v. Van Tran*, 864 S.W.2d 465, 470 (Tenn. 1993). Under the Tennessee Code at the time, a defendant could be sentenced to death if the jury found that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." *Id.* at 478 (quoting Tenn. Code Ann. § 39-2-203(i)(5) (1982)). On direct appeal, the Tennessee Supreme Court disapproved of the deletion of the words "heinous" and "atrocious" from the instruction but ultimately affirmed on the grounds that the curtailed instruction did not likely confuse the jurors, that the jury still made the dispositive "depravity of mind" finding, and that the omission had no effect on the result. *Id.* at 479.

We must uphold the Tennessee Supreme Court's finding that Van Tran committed murder in an especially cruel way that evinced depravity of mind because the court did not unreasonably apply the constitutionally permissible narrowing construction of the statute established by previous decisions of the court. Even if the instruction given by the sentencing court is deemed to be unconstitutionally vague, we will still uphold the sentence where the state appellate court properly applied a narrowing construction of a possibly vague statutory

enhancement. *Walton v. Arizona*, 497 U.S. 639, 653–54 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). The United States Supreme Court has previously affirmed a sentence of death under the arguably vague statutory aggravating circumstance that was applied in this case, because the Tennessee Supreme Court "has recognized that its narrowing construction is constitutionally compelled and has affirmatively assumed the responsibility to ensure that the aggravating circumstance is applied constitutionally in each case." *Bell v. Cone*, 543 U.S. 447, 456 (2005).

Here, the state supreme court was guided by the constitutionally permissible narrowing construction of the statute enunciated in *State v. Williams*, 690 S.W.2d 517 (Tenn. 1985). "Torture" or "depravity of mind" must also be found in addition to cruelty, heinousness, or atrociousness, and "depravity of mind" can be found even where there is no gratuitous infliction of severe pain, physical or mental, that amounts to torture. *Id.* at 529. "Moral depravity" is equivalent to a state of mind of "moral corruption," which could be shown by a willingness to torture, but could also be shown by other morally corrupt acts, such as mutilation of a dead body. *See id.* at 529–30. Although the trial court omitted heinousness or atrociousness as aggravating factors, the court gave the *Williams* definitions of "cruelty" and "depravity of mind" and stated that a finding of both was sufficient to impose the death sentence on Van Tran; the Tennessee Supreme Court relied upon this truncated instruction in affirming Van Tran's sentence of death. *Van Tran*, 864 S.W.2d 465, 479. We have previously held that the narrowing construction of *Williams*, including the implication that depravity of mind or torture can be found without torture, is constitutionally permissible. *Payne v. Bell*, 418 F.3d 644, 660 (6th Cir. 2005). In particular, we noted that the *Williams* construction incorporated and expounded on previous decisions of the state supreme court, including constructions already declared constitutional by the United States Supreme Court. *See id.*

Here, the state supreme court reasonably applied the constitutionally permissible narrowed construction of the aggravating circumstance as interpreted and applied in the state court's previous decisions. *See Bell v. Cone*, 543 U.S. at 457. The facts of this case fit within the narrowed definition as applied in these previous cases. The state supreme court in Van Tran's case followed *State v. Black*, in which it had previously held that the "brutal and senseless

execution style murder of a helpless child, who could not protect herself, evinces torture or depravity of mind." 815 S.W.2d 166, 181–82 (Tenn. 1991). Analogously, Van Tran's victim was helpless, since Kai Yin Chuey was a slight seventy-four-year-old woman whom Van Tran had already shot through the throat and who was lying defenseless on the floor. And like *Black*, when Van Tran placed his gun to her head and fatally shot her, he was committing an execution-style murder, in which the murderer kills the victim by shooting them at close range after rendering them helpless. The Eleventh Circuit in *Hargrave v. Wainwright*, in a similar situation, explained:

> An execution-style murder, as defined by the Florida courts, is typically one in which the defendant, without provocation, first renders his victim helpless—for example, by wounding the victim, tying the victim's hands, or ordering the victim to the floor—and then shoots the victim in the head at close range, often to eliminate the victim as a future witness.

804 F.2d 1182, 1195 (11th Cir. 1986). In *State v. Dicks*, 615 S.W.2d 126, 127, 132 (Tenn. 1981), the Tennessee Supreme Court held that a murder was especially heinous, atrocious, or cruel where the defendant slashed the victim's throat while the victim lay unconscious due to a blow to the head. The U.S. Supreme Court has approved the narrowing construction of the aggravating circumstance that the Tennessee Supreme Court used in *Dicks*, stating that an aggravator "directed at the conscienceless or pitiless crime which is unnecessarily torturous to the victim" meaningfully narrows the discretion of the court and thereby avoids a constitutional vagueness problem. *Bell v. Cone*, 543 U.S. at 457–58 (quoting *Dicks*, 615 S.W.2d at 132) (internal quotation marks omitted).

Under these precedents and with a view of the evidence in the light most favorable to the State, it was reasonable for the state court to conclude that a rational trier of fact could have found beyond a reasonable doubt that Van Tran acted with depravity of mind. In the statement Van Tran made to the police, he indicated that he shot Kai Yin Chuey once accidentally and once intentionally. *Van Tran*, 864 S.W.2d at 468-69. The Tennessee Supreme Court described her as a helpless seventy-four-year-old woman who had already been shot by Van Tran and was lying on the floor unable to protect herself when Tran shot her in the back of her head. *Id*. at 480. She was four feet, nine inches tall, and weighed only ninety pounds. The shot to the back of her head was a contact wound, where the muzzle of the weapon was placed against the skin's surface. *Id.*

at 470. Kai Yin Chuey was not a threat to Van Tran, and by the time he shot her the second time Arthur Lee was no longer a threat because Van Tran had killed him. Because the Tennessee Supreme Court's decision that a rational trier of fact could have found Tran showed depravity of mind was not objectively unreasonable, we cannot grant Van Tran habeas relief on the basis that the application of the aggravating circumstance was unconstitutional.

**D.  Ineffective Assistance of Counsel Claim**

Van Tran argues that penalty phase counsel failed to investigate and present mitigating evidence, failed to introduce evidence to rebut the "depravity of mind" aggravating circumstance, failed to object to prosecutorial misconduct in closing argument, and failed to preserve and present issues on appeal. This court certified Tran's claim that counsel failed to investigate and present mitigating evidence, but not his other ineffective-assistance-of-counsel claims. This court cannot consider claims not certified for appeal, so those claims will not be addressed. *See* 28 U.S.C. § 2253(c); *Abdur'Rahman v. Colson*, 649 F.3d 468, 473 (6th Cir. 2011).

Because the state court did not unreasonably apply the *Strickland* standard that governs ineffective-assistance-of-counsel claims, Van Tran is not entitled to relief on this ground. Under the deferential review standards of AEDPA, the already deferential *Strickland* standard becomes doubly deferential: "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011). In order to gain relief, Van Tran must satisfy both *Strickland* prongs: he must prove both that his counsel was objectively deficient and that he was prejudiced by his counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The postconviction review court found that Van Tran had neither proven that trial counsel conducted an improper investigation or had unreasonably failed to present mitigating evidence, nor established prejudice. *Van Tran*, 1999 WL 177560, at *12 (Tenn. Ct. Crim. App. Apr. 1, 1999). Van Tran is not entitled to relief if we find that the postconviction review court was not unreasonable in its determination regarding just one of the prongs.

Because the state postconviction court's determination that Van Tran suffered no prejudice was a reasonable application of the prejudice prong of the *Strickland* test, and the court

relied on a reasonable determination of the facts, Van Tran must be denied habeas relief according to § 2254(d). Numerous relevant mitigating circumstances about Van Tran's continuous social and education deprivations throughout life were presented at the initial trial; the additional mitigating evidence that Van Tran argues would have been presented had his counsel pursued further investigation is similar to and cumulative to the evidence that was actually presented. The balance of mitigating and aggravating circumstances was close and the presentation of additional and more precise mitigating circumstances about Van Tran's upbringing and emotional and mental states may have made a difference in the jury's ultimate determination. However, we cannot say that the state postconviction court was unreasonable in determining that because "[m]uch of this evidence is similar to that which was presented to the jury," Van Tran had failed to "establish[] a reasonable probability that the jury's determination would have been different." *Van Tran*, 1999 WL 177560, at *12.

The state court found that trial counsel had presented various forms of evidence in mitigation that were considered in adjudicating Van Tran's culpability, including his "cooperation with the FBI, good employment history, lack of prior criminal involvement, remorse for the homicides, personal history as a child of a Vietnamese mother and an American father, difficult childhood and educational problems." *Van Tran*, 1999 WL 177560, at *12 (citing *Van Tran*, 864 S.W.2d at 482). These mitigating circumstances were presented during the testimony of several witnesses, including Van Tran's mother, supervisors from Van Tran's jobs, and Dr. Khanna, a clinical psychologist who testified that Van Tran was below average intelligence, depressed, and under a great deal of stress. *Id.* at *8, 11. For instance, Dr. Khanna testified to horrid abuses during Van Tran's childhood, including a time spent in an orphanage, a time spent with his aunt in the countryside where she tied him to a tree naked and he was bit by ants, a period in which he lived alone on the streets as a young child, and early exposure to illicit substances. Dr. Khanna also testified that Van Tran had been abusing an inordinate amount of drugs and alcohol in the three days preceding the robbery, such that "he had lost all judgment— all reason—and he didn't know probably where he was." Van Tran's trial counsel thus appears to have presented a fairly thorough, if not comprehensive, social and personal history of Van Tran that highlighted many mitigating factors.

The mitigating evidence that Van Tran argues his counsel failed to present is remarkably similar to the kind of evidence that was presented at trial. None of the evidence differs much in substance from what was presented; it differs mostly in form. Van Tran argues that his trial counsel should have provided the testimony of more experts: a licensed social worker fluent in Vietnamese and English to testify about the sociocultural history of Vietnam and the plight of the Amerasian population; a board-certified psychologist to testify about Van Tran's post-traumatic stress disorder and the effects of his Amerasian status on his psychological well-being; an internist with a specialty in addiction to testify at greater length about Van Tran's chemical dependency issues arising out of hypervigilance related to his difficult upbringing, and how this would have affected his perception and judgment during the murder; and, finally, a board-certified forensic and child psychiatrist to attest to Tran's hypersensitivity and threat perception and explain their origins in his traumatic upbringing. Appellant's Br. at 69–77. Van Tran argues that this information "changes the 'entire evidentiary picture'" by "answer[ing] the questions . . . left unanswered about the significance of Tran's early history, his status as an Amerasian, why he abused drugs, and whether shooting Kai Yin Chuey was a cold-blooded act." Appellant's Br. at 77–78. But the TCCA could reasonably conclude that the picture is not that different.

The most significant difference between what evidence was presented at trial and what was presented in the postconviction proceeding is that the latter is presented in more scientific terms. *See, e.g.*, Appellant's Br. at 78 (describing the evidence that trial counsel failed to present as a "scientifically-grounded portrait of Tran"). Although the form of the proposed additional mitigation evidence differs in its manner of presentation, the differences are, from the jury's perspective of final decisionmaker, somewhat superficial. That is, the substance of these different analyses—whether based on Van Tran's neurophysiology, the outcast social status of Amerasians, or the chemical and physiological details of his substance abuse—is substantially the same: Van Tran has suffered immense deprivation and misfortune during his life, which have all had a great impact on his ability to reason and make decisions. Precisely this argument was presented to the jury by the trial testimony of Dr. Khanna.

Methodological diversity and precision are not necessarily sufficient to demonstrate that the jury would have arrived at a different conclusion, particularly where the jury's final

determination is one that is unconstrained by technical scientific jargon. Here, the jury was asked to find simply whether Van Tran's crime was especially cruel, in that it involved depravity of mind. Boiled down to this purest essence of common-sense judgment, this determination requires no specialty in psychology, psychiatry, neurophysiology, psychopharmacology, or sociocultural anthropology.

The superfluity of presenting the same substance in a different form is supported by our precedent. In *Clark v. Mitchell*, this court held that a state court was reasonable in determining that a petitioner had failed to demonstrate prejudice by his counsel's failure to present mitigation evidence in a suppression hearing in which the issue was whether the defendant had waived his rights voluntarily and knowingly. 425 F.3d 270, 281–82 (6th Cir. 2005). At the suppression hearing, a psychiatrist had testified in favor of the defendant, concluding that the defendant's mental function would be considered "borderline defective" and that he suffered from acute brain damage that would have interfered with his decision making abilities. *Id.* at 274–75. On appeal, the defendant argued that his counsel should have presented testimony from a neuropsychologist or pharmacologist to present evidence about organic brain syndrome and defendant's drug addiction and related withdrawal symptoms, which arguably would have more comprehensively explained his actions. *Id.* at 276. This court held that

> [t]he state court was also reasonable in determining that Clark had failed to demonstrate prejudice as a result of his counsel's failure to introduce evidence from a neuropsychologist or pharmacologist at his suppression hearing or at trial. Clark's defense team introduced evidence at Clark's suppression hearing from a psychiatrist who concluded that Clark was suffering from depression, suicidal tendencies, and brain impairments that would have made Clark less able to understand his choices and to resist pressure from other individuals. It thus was reasonable for the state court to conclude that *new information sought to be introduced by Clark about his drug addiction and brain disorder did not differ in a substantial way from the evidence actually presented* at the suppression hearing and, accordingly, that Clark could not demonstrate that he was prejudiced by his counsel's failure to present such evidence.

*Id.* at 282–83 (emphasis added).

Although in the present case Van Tran presents a much more substantial argument about the presentation of his case in mitigation, his argument still suffers from the same problem that the *Clark* petitioner's did, namely that the evidence does not differ in a substantial way from the

evidence actually presented at trial. Van Tran's counsel presented substantial testimony about Van Tran's horrific childhood and his dependence on drugs and the impact these influences had on his psychological state at the time of the crime. The court of criminal appeals followed this analysis in arriving at its conclusion:

> The suggested mitigating evidence related to petitioner's cultural and social background and his medical condition. Much of this evidence is similar to that which was presented to the jury. Furthermore, considering the nature and circumstances of the offense, and the applicability of the two aggravating circumstances of mass murder and depravity of mind, we conclude petitioner has not established a reasonable probability that the jury's determination would have been different had this evidence been presented.

*Van Tran*, 1999 WL 177560, at *12. "[F]airminded jurists could disagree" on whether this is the correct result under federal law, and therefore we must uphold the state court's decision under AEDPA as not an unreasonable application of established federal law. *See Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

Accordingly, Van Tran is not entitled to relief for his claim of ineffective assistance of counsel.

## III.

Van Tran is not entitled to relief on his ineffective-assistance-of-counsel or unconstitutional vagueness claims. The state court's application of Tennessee law with regard to whether Van Tran is intellectually disabled under *Atkins* was contrary to clearly established federal law. Accordingly, we VACATE and REMAND to the district court so that the district court may grant a CONDITIONAL WRIT OF HABEAS CORPUS prohibiting execution unless the State completes a new *Atkins* hearing consistent with this opinion.